Betty CARNES (Deceased); Phillip Carnes, Widower, Appellant,

v.

TREMCO MANUFACTURING COMPANY; Irene Steen, Administrative Law Judge; and Workers' Compensation Board, Appellees.

No. 1999–SC–0536–WC.

Supreme Court of Kentucky.

Oct. 26, 2000.

John E. Anderson, Cole, Cole, Anderson & Nagle, PSC, Barbourville, for Appellant.

W. Barry Lewis, Lewis and Lewis Law Offices, Hazard, for Appellee Tremco Manufacturing Company.

## OPINION OF THE COURT

This workers' compensation appeal concerns whether a finding that a worker's death did not arise from her employment was erroneous as a matter of law.

It is undisputed that Betty Carnes and Delmar Partin were co-workers and that they had engaged in an extramarital relationship which Carnes eventually ended. Approximately two to three months later, on September 26, 1993, Carnes was murdered by Partin while in the workplace. *See Partin v. Commonwealth,* Ky., 918 S.W.2d 219 (1996). Carnes' widower filed this claim on behalf of himself and their minor children. The parties agree that Partin was motivated by anger because Carnes had ended the relationship.

Carnes normally worked in the swiggle department, making an insulating tape used in thermal pane windows; however, she sometimes worked overtime on weekends as an assistant in the quality assurance lab. Partin worked in the lab. His duties required him to go to the swiggle department periodically to pick up samples

for testing. Partin's personnel file contained a request that he not be asked to work on Sundays due to his religious convictions.

The swiggle department supervisor testified that in the three-month period prior to Carnes' death, he had seen her and Partin sitting at a table together during breaks and talking while she was working on the line. Several times, at Carnes' request, he had asked Partin to leave the department when he stayed longer than was necessary in order to talk with her. He explained that Carnes had said she did not want to talk to Partin and had asked him to stay away. He also testified that he had requested Partin's supervisor to keep him out of the department if he had no business there. On the Friday before her death Carnes had indicated that she was scheduled for overtime in the lab on the weekend but did not want it publicized. He testified that he had known Partin for 15–17 years and had no reason to believe that Partin was a danger to the deceased.

Robert Cornett worked near Carnes and had observed her and Partin when Partin came to the department. He testified that in the weeks immediately preceding her death, the deceased began to act nervous in Partin's presence and had told him she was afraid of Partin because she was ending their relationship. He also testified that she did not want Partin to know her work schedule.

Barbara Mason, another co-worker, testified that Partin spent an inordinate amount of time with Carnes when he came to the swiggle department. Carnes had told her she was afraid of Partin, and she thought he had been harassing Carnes at home and at work. She testified that Carnes did not put her time card in the rack so that Partin would not know her work schedule. Carnes knew that Partin did not work in the lab on Sundays.

Carnes was murdered on a Sunday while working in the lab. The plant was not operating at full strength; however, her supervisor indicated that approximately 10 to 12 other people would have been working at the time. There was evidence that the plant was not open to the public and that, like outsiders, off-duty workers would be questioned concerning why they were at the plant and would be asked to leave if they had no business there. The watchman/janitor who was on duty on September 26, 1993, testified that Partin came to the plant that morning carrying a small paper bag and told him that he was bringing a book to Herbie Smith.

The supervisor of the lab testified that Partin had asked several times to be scheduled to work with Carnes on Saturday, September 25, 1993; however, he did not schedule Carnes for that day. Instead, he had scheduled Carnes to work with Herbie Smith on Sunday, the 26th. He testified that Smith's work would have required him to be out of the lab for periods of 5–30 minutes to obtain samples. He testified that he had received a complaint that some of his men spent too much time in the swiggle department, that he had no reason to believe that Partin was dangerous before the murder, and that he was not aware that Carnes wanted help in avoiding Partin.

The human resources manager testified that Partin had never been written up for spending excessive time in the swiggle department. She testified that the company had a policy concerning harassment. She was unaware that Partin had harassed Carnes and noted that he had never been reprimanded for doing so. Carnes had told her she was being harassed outside of work but was uncertain of the identity of the perpetrator and did not indicate that it was Partin. Carnes had indicated that she did not want to be scheduled to work with Partin but did not say why. The manager testified that she had no reason to believe that Partin was dangerous before the murder and that, in September, 1993, there was no company policy concerning the presence of off-duty employees at the plant.

Dr. Granacher, who is board certified in forensic psychiatry, reviewed the record in both the criminal and workers' compensation cases. His opinion was that Partin's motive was unrelated to work but rather was his rejection by Carnes. He did not think that the workplace facilitated the murder or that there was anything the employer could reasonably have done to prevent it. There was no prior evidence that Partin was dangerous.

Dr. Feldmann, a board certified forensic psychiatrist who studies workplace violence, also reviewed the records. He concluded that Partin's intense interest in Carnes and Carnes' indications that she was fearful of Partin evidenced a risk that Partin would eventually become violent after being rejected. He testified that the motive for the murder was Carnes' rejection of Partin. He testified concerning actions an employer could take to decrease the likelihood of workplace violence.

Detective Adams, a state police detective who testified concerning the murder investigation, indicated that although the attack occurred in an open area of the lab, the area was obscured from view. He testified that Carnes had contacted the state police in an attempt to learn who had harassed her outside the workplace but later asked them to drop the matter.[1] He indicated that at the time Carnes was murdered the company had no policy concerning workplace violence, knew little about dealing with workplace violence, and had probably done the best it could. He discussed various precautions an employer could take to help reduce the likelihood of workplace violence. Another state policeman testified that there is a very high fatality rate in stalking situations.

■ The Administrative Law Judge (ALJ) who considered the matter concluded that Carnes' murder did not arise out of the employment and dismissed the claim.

The ALJ explained that no work-related events gave rise to the murder; instead, it resulted from the purely personal relationship of Carnes and Partin. The ALJ was not persuaded that the employment had exacerbated or facilitated Carnes' death simply because she was working on a Sunday or because the employment provided Partin with an opportunity to carry out the murder. The ALJ noted that Partin was harassing Carnes outside the workplace as well as within it. Although the plant may have operated with only a few workers on the morning of Carnes' murder, she was not working alone and was not totally isolated. Carnes requested that she be scheduled for overtime when Partin was not working, requested that her schedule not be revealed, asked her supervisor to get Partin to leave the swiggle department when he stayed longer than necessary to perform his work, and complained to her friends about him. However, she also was seen with him during breaks, did not request that disciplinary action be taken against him, did not request protection from him, and withdrew her request that the state police investigate the harassment. The ALJ noted that no Kentucky authority was precisely on point and concluded that the fact that the murder occurred in the workplace was not a sufficient causal nexus from which to conclude that it arose out of the employment. *See January–Wood Co. v. Schumacher*, 231 Ky. 705, 22 S.W.2d 117 (1929). The ALJ also concluded that the positional risk theory did not apply to these facts.

The decision was affirmed by the Workers' Compensation Board (Board) and the Court of Appeals. This appeal by the claimant followed.

KRS 342.0011(1) provides that a compensable injury must arise both "out of" and "in the course of" the employment. In *Schumacher*, a night watchman was killed

---

1. Adams indicated that letters were sent to the wives of male employees accusing the employees of having an affair with Carnes. An advertisement falsely indicated that Carnes' automobile was for sale. Another advertisement offering the services of an exotic dancer gave her home telephone number.

while working, after which his widow filed a claim for workers' compensation benefits. The Court noted that the deceased was not killed because he was the company's night watchman on duty but because he was the husband of the murderer's paramour. *Id.* at 120. In considering whether the death arose out of the employment, we stated:

> Does the fact that his duty put him in such a place as gave his murderer an opportunity to carry out his nefarious design with less probability of apprehension than if he did so elsewhere constitute such causal relation as to bring the result within the term "arising out of his employment"? We hardly think so, on both reason and authority.
>
> The Compensation Act does not afford compensation for injuries or misfortunes which are merely contemporaneous or coincident with the employment or collateral to it. There must be a direct causal connection between the employment and the injury. That is an essential connecting link to the operation of the act. It is absent in this case. Schumacher's death cannot be traced to any cause set in motion by his employment. We cannot reason from the sequel to the cause. The fact that he was on the company's premises at work when killed by Eddings for reasons wholly unconnected with his employment and entirely unassociated with the relation existing between his employer and himself does not seem to this court sufficient to justify an award of compensation, which is in effect but holding the company responsible in a degree for his murder.

*Id.*

The claimant asserts that *Schumacher* is distinguishable. He argues that here, unlike *Schumacher,* the conditions of the deceased's employment did contribute to her death and, therefore, that her death is compensable. He argues: 1.) that despite the fact that Carnes reported workplace harassment by Partin to her supervisor, Partin was not reprimanded; 2.) that be-

cause he was an employee, Partin was permitted to enter the plant while off-duty; and 3.) that the lab where Carnes worked was in a secluded area, thereby facilitating the murder. He urges the Court to adopt the view that even if the motivation for an assault is personal, its effects should be compensable if the work environment in any way contributed to, exacerbated, or facilitated its commission.

Larson, *Larson's Workers' Compensation Law* (2000 Edition), indicates that a workplace assault which results from a private quarrel may be viewed as arising from the employment if but for the conditions and obligations of the employment, the assault would not have occurred. *Id.* at § 8.02(2). A workplace assault which has its origins in a private relationship may be viewed as compensable where the employment environment facilitated or contributed to causing an assault which would otherwise not have occurred. *Id.* at § 8 02(3). For example, although personally motivated, an assault on a night security officer or a taxi driver, an assault which results from friction produced while the assailant and victim are working in close contact, an assault on an individual for whom it is a risk inherent in the employment, or an assault with a weapon from the workplace may be viewed as work-related. *Id.* at § 8.02(3)(a)-(e). However, Larson recognizes that even where two workers meet on the job, if they choose to enter into a purely private relationship, and in the course of that private relationship have a private quarrel, the quarrel may well be viewed in the same manner as a domestic quarrel brought to the employment. *Id.* at § 8.02(2).

In the instant case, the ALJ considered the claimant's argument but was not persuaded that the employment had exacerbated or facilitated Carnes' death. The claimant bears the burden of proof and risk of nonpersuasion with regard to every element of the claim, and the decision of the ALJ is "conclusive and binding as to all questions of fact." KRS 342.285;

*Wolf Creek Collieries v. Crum,* Ky.App., 673 S.W.2d 735 (1984). Thus, where the party with the burden of proof is not successful before the ALJ, the issue on appeal is whether the evidence in that party's favor is so compelling that no reasonable person could have failed to be persuaded by it. *See Special Fund v. Francis,* Ky., 708 S.W.2d 641, 643 (1986).

We have reviewed the evidence and the arguments of the parties. Having done so, we are not persuaded that the evidence compelled a finding in the claimant's favor. Under those circumstances, is it unnecessary for us to consider whether a favorable finding would have compelled a conclusion that Carnes' death arose from the employment.

The decision of the Court of Appeals is affirmed.

LAMBERT, C.J., and COOPER, JOHNSTONE, KELLER, STUMBO, and WINTERSHEIMER, JJ., concur.

GRAVES, J., dissents without opinion.